IN THE MATTER OF THE APPLICATION OF PETER JACOBS FOR WRITS OF HABEAS CORPUS AND CERTIORARI, ETC.

*Constitutional protection of property — a man's right to labor is property — right of the legislature to restrain it by police regulations — the court may examine the act to see if it is in fact, as well as in name, a police regulation.*

The term property, as used in the section of the Constitution providing that no person shall be deprived of life, liberty or property without due process of law, includes the right of a person to work and to employ his labor to his own best interests and advantage.

The legislature cannot, by any arbitrary enactment, deprive a laborer in any lawful avocation of his right to work, and enjoy the fruits of his work in his own residence and in his own way, except for the purposes of police or health regulations.

An act so depriving a person of the right to his own labor cannot be sustained by

·simply inserting therein a declaration that it was passed as a police regulation and to preserve the public health or safety. It must in fact be such a regulation and have been passed for that purpose and not for some other and different purpose.

Chapter 272 of 1884 — prohibiting in cities having over 500,000 inhabitants the manufacturing of cigars or preparation of tobacco in any form on any floor, or in any part of any floor, in any tenement house as therein defined, if such floor, or any part of such floor, is by any person occupied as a home or residence for the purpose of living, sleeping, cooking or doing any household work therein — was not passed to improve the public health or regulate the use of tenement houses as stated in its title, but to suppress and restrain the manufacture and preparation of tobacco in the cases covered by the act, for the purpose of preventing successful competition injurious to other modes of manufacturing the same article, and the said act is for that reason unconstitutional and void.

APPEAL from an order made at a Special Term, dismissing writs of *habeas corpus* and *certiorari* and remanding the appellant to custody.

*Wm. M. Evarts, A. J. Dittenhoeffer* and *Morris S. Wise,* for the relator appellant.

*Peter B. Olney* and *John Vincent,* for the respondent.

DAVIS, P. J.:

Prior to the 12th day of May, 1884, Peter Jacobs, the appellant in this ·case who is by occupation a manufacturer of cigars carried on that business on the first floor of a tenement house in the city of New York in which he resided, and with his family occupied the whole of that floor comprising seven rooms, in one of which he manufactured his cigars. His business was a lawful one; but on the 12th of May, 1884, the legislature passed an act making the manufacturing of cigars, etc., when carried on in such tenement houses as that occupied and used by the appellant, a criminal offense punishable by fine or imprisonment, or both. The tenement house in which Jacobs manufactured his cigars was clearly within the description of the act; and the manufacture being continued by him after the twelfth of May, in the same manner as before, he was on the fourteenth of that month arrested on due complaint and warrant, and after examination committed, in default of bail, by a police magistrate of the city. He sued out a writ of *habeas corpus* and of *certiorari,* on the return to which after due hearing the Special

Term of this court dismissed the writs and remanded the appellant. This appeal is taken from the order of the Special Term.

The question presented at Special Term and on this appeal relates solely to the constitutionality of the act under which the appellant was arrested. . (Chap. 272, p. 335, Laws of 1884.) The act is as follows:

AN ACT to improve the public health by prohibiting the manufacture of cigars and preparation of tobacco in any form in tenement houses in certain cases, and regulating the use of tenement houses in certain cases, passed May 12th, 1884.

*The People of the State of New York, represented in Senate and Assembly, do enact as follows:*

SECTION 1. The manufacture of cigars or preparation of tobacco *in any form on any floor*, or in any part of any floor, in any tenement house is hereby prohibited, if such floor, or any part of such floor, is by any person occupied as a home or residence for the purpose of living, sleeping, cooking or doing any household work therein.

§ 2. Any house, building, or portion thereof occupied as the home or residence of more than three families, living independently of one another, and doing their cooking upon the premises, is a tenement house within the meaning of this act.

§ 3. The first floor of said tenement house on which there is a store for the sale of cigars and tobacco shall be exempt from the prohibition provided in section one of this act.

§ 4. It shall be the duty of every sanitary inspector of any city to which this act is applicable to report any violation of this act coming to his knowledge forthwith to a police magistrate, and to procure the punishment of the person or persons having committed such violation; but this provision shall not be construed to preclude any other citizen from performing the duty herein assigned to said sanitary inspector.

§ 5. Every person who shall be found guilty of a violation of this act, or of having caused another to commit such violation, shall be deemed guilty of a misdemeanor, and shall be punished for every offense by a fine of not less than ten and not more than one hundred dollars, or by imprisonment for not less than ten days and not more than six months, or both such fine and imprisonment.

§ 6. This act shall apply only to cities having over five hundred thousand inhabitants.

§ 7. All acts or parts of acts inconsistent with this act, are hereby repealed.

§ 8. This act shall take effect immediately.

This act, it will be observed, is a local one, having no general operation throughout the State. It is in force by its terms, only in cities "having over five hundred thousand inhabitants;" and as the courts can take judicial notice of the population of cities, it must be held to be applicable only to the cities of New York and Brooklyn.

Its title although it does not declare this fact, is probably definite enough to save it from the condemnation which the Court of Appeals imposed on the similar act of 1883. (Chap. 93, Laws of 1883; *In the Matter of Paul*, 94 N. Y., 497.) By its second section the act declares the kind of "tenement house" to which alone it is applicable, to wit, "any house, building or portion thereof occupied as the home or residence of more than three families, living independently of one another, and doing their cooking upon the premises." In such a tenement house the act prohibits the manufacture of cigars or preparation of tobacco in any form, not generally, but on any floor or in any part of any floor if such floor or any part of such floor is by any person occupied as a home or residence for the purpose of living, sleeping, cooking or doing any household work therein; and to this the third section adds the exception that if on the first floor of such tenement house there is a store for the sale of cigars and tobacco, that floor shall be exempt from the operation of the act.

It seems entirely clear that this act, if valid, operates to deprive the owner or occupant of any floor in such a tenement house as it describes, with the exception mentioned, of the right to carry on his lawful occupation by which he supports himself and family, in any part of his own residence. That right is in a general sense his own absolute property, and he is protected in its enjoyment by the Constitution of the State. "The property" says Smith in his Wealth of Nations, "which every man has in his own labor as it is the original foundation of all other property, so it is the most sacred and inviolable. The patrimony of the poor man lies in the strength and dexterity of his own hands, and to hinder him from employing

the strength and dexterity in what manner he thinks proper, without injury to his neighbor, is a plain violation of this most sacred property. It is a manifest encroachment against the just liberty both of the workman and those who might be disposed to employ him. As it hinders the one from working at what he thinks proper, so it hinders the other from employing whom they think proper."

In *Bertholf* v. *O'Reilly* (74 N. Y., 515) it was said: "The right to life includes the right of the individual to his body in its completeness and without dismemberment; the right to liberty, the right to exercise his faculties and to follow a lawful avocation for the support of life; the right of property, the right to acquire, possess and enjoy it in any way consistent with the equal rights of others and the just exactions and demands of the State."

In *Live Stock, etc., Association* v. *The Crescent City, etc., Company* (1 Abb. [U. S.]; 398) it is said: "It is one of the privileges of every American citizen to adopt and follow such lawful industrial pursuit — not injurious to the community — as he may see fit without unreasonable regulation or molestation. * * * There is no more sacred right of citizenship than the right to pursue unmolested a lawful employment in a lawful manner. It is nothing more than the sacred right of labor."

In the celebrated *Slaughter House case* (16 Wall., 116, 122), BRADLEY, J., in his dissenting opinion, says: "This right to choose one's calling is an essential part of that liberty which it is the object of government to protect; and a calling when chosen is a man's property and right. Liberty and property are not protected where these rights are arbitrarily assailed. * * * In my view a law which prohibits a large class of citizens from adopting a lawful employment, or from following a lawful employment previously adopted, does deprive them of liberty as well as property without due process of law. Their right of choice is their liberty; their occupation is their property."

A French edict declares that "God in giving to man wants and desires rendering labor necessary to their satisfaction, conferred the right to labor on all men, and this property is the first, most sacred and imprescriptable of all. (Edict of Louis XVI, 1776.)

And Chancellor KENT (2 Kent's Comm., 1) defines the absolute rights of individuals as "the right of personal security, the right of

personal liberty and the right to acquire and enjoy property. These rights," he says, "have been justly considered and frequently declared by the people of this country to be natural, inherent and inalienable." Without citing further authorities, it may be stated as a legal and political axiom that since the great laboring masses of our country have little or no property but their labor, and the free right to employ it to their own best interests and advantage, it must be considered that the constitutional inhibition against all invasions of property without due process of law, was as fully intended to embrace and protect that property as any of the accumulations it may have gained. It is not constitutionally competent, therefore, for the legislature to deprive, by any arbitrary enactment, a laborer, in any lawful avocation, of his right to work and enjoy the fruits of his work in his own residence and in his own way, except for the purposes of police or health regulations as hereinafter considered. It is equally true also that when an artisan or laborer has rented a tenement for the residence of his family, with the right to carry on his trade or occupation therein, he has thereby acquired certain rights of property in the use and enjoyment of his tenement of which he cannot be deprived without due process of law. An arbitrary law for the mere purposes of such deprivation is absolutely dead at its birth by force of the Constitution of the State.

These general principles are hardly disputed on the part of the respondents; but it is insisted quite correctly that they are subject to an exception or limitation which permits the enactment of laws which may regulate or limit or restrain the enjoyment and use of such absolute rights and property, by police regulations to preserve the public peace, safety or health, and that the legislature is the sole judge of what laws are necessary or requisite to those ends.

Without pointing out what exceptions, conditions and refinements are applicable to these propositions it is enough to say, in the words of the respondent's counsel, that " it is the undoubted province of the courts to decide whether or not any particular Act was or was not upon its face passed by the legislature in the exercise of its police power and as a health regulation."

In this case the appellant, while in the exercise of a perfectly lawful right to use and enjoy the property of his own labor, by con-

ducting a manufacture in the line of his avocation quietly and peaceably in his "own hired house," suddenly finds his business declared a crime and himself absolutely prohibited from carrying it on in his own house under severe criminal penalties by an Act of the legislature which takes effect immediately, and he presently is arrested and held in custody for using his accustomed mode of earning the bread of himself and family. When he impugns the Act under which this is done he has a right to demand that the courts shall inquire whether the Act is a valid exercise of the power to enact police regulations to preserve public health or safety. And this means more than that the Act professes to be of that kind. It means that it must be so in reality and not something else in the guise of such a purpose.

A careful study of the Act has satisfied us that its aim was not " to improve the public health by prohibiting the manufacture of cigars and preparation of tobacco in any form in tenement houses in certain cases, and regulating the use of tenement houses in certain cases" as declared in the title, but to suppress and restrain such manufacture in the cases covered by the Act for the purpose of preventing successful competition injurious to other modes of manufacturing the same articles. We think we find abundant evidence of this object on the face of the Act: First. It selects for its field of operation, from the general and numerous tenement houses of the city a limited class, to wit, such as are "*occupied as the home or residence of more than three families living independently of one another and doing their cooking upon the premises.*" The result of this selection is that all tenement houses having more than three, or more than twenty families, living in common but not doing their cooking on the premises, are not within the act. Certainly if health were the object, all such tenements would be embraced for they are especially within the professed mischief. It is the thronged and overcrowded tenements which swarm from cellar to attic with tenants who live not independently but in promiscuous dependence without cooking in their tenements, but from hand to mouth in the streets and grog shops, or as beggars at houses for food, whose health most needs the protection of police regulations; but they are not included within the Act. Again, by the third section the first floor of the designated tenement is exempt from

the operation of the law if, in addition to the manufacture, there be a store for selling cigars and tobacco on that floor. That fact, if health were the object, should be a reason for more stringent restriction instead of exception, because it would cause that floor to be the resort of more persons whose health might be exposed; but one nuisance to health is, in the theory of the act, cured by another. It is of no consequence that on the same floor there may be a half dozen families each carrying on the manufacture of cigars or tobacco in their living rooms, where they eat, sleep and cook. They are not subject to the law, while the head of a family on the next or any other floor of the same tenement is a criminal for carrying on his occupation of manufacturing cigars in any room of such floor. Surely this sort of discrimination must be based upon some other idea than the health of tenants, or of the public. It is too vicious to be just or lawful. But in the prohibited tenement, the manufacture is made criminal only " on any floor or part of any floor occupied by any person as a home or residence for the purpose of living, sleeping, cooking or doing any household work therein." This section has no regard to the size of the floor. There may be ten or twenty rooms (and in some of the tenement houses there are numerous rooms on each floor), isolated so as to have no communication with each other, yet the bare fact that some person eats or sleeps or lives in one of the most distant rooms of the floor, without communication or connection with that used for the business, makes it a crime to manufacture cigars in any other room on that floor. Again, under this Act every one of the seven rooms occupied by the appellant and his family may be used for the purpose of manufacturing cigars and tobacco by himself or other tenants occupying the several floors above for the purpose of living, sleeping, cooking and doing household work, and the case will not be within the statute. If the aim be to protect health, why is not such a case brought within the prohibition.

But it may be argued that the intention was to make the manufacture criminal only because of danger to the health of persons who live or sleep or cook or do some sort of household work, on the same floor. Why, then, it may be repeated is the exception made which allows the health of such persons to be exposed if only there be the addition on the same floor of a store to sell cigars and tobacco ?

Health is absolutely lost sight of in such a case and no sensible reason can be perceived for such an exception unless, indeed, some promoter of the law happened to be in that condition as a maker and vender, and needed the exception to protect him.

But, again, if the health of occupants of the same floor were alone in view, why is the act applied only to tenements occupied as the home or residence of more than three families. If the occupants are limited to three families or less, any or every one of them may make cigars or manufacture tobacco in any or every room on his floor and the act does not condemn it. It is not easy to see if the object be to protect the health of persons living on the floor of the manufacture, why such health does not require as much protection in the case of three tenants in the same building as of four.

Under the Act, if there be but three families "living independent of one another and doing their cooking on the premises," either may manufacture cigars or tobacco on a floor and in the living rooms of any number of people without limit; but if there be four families in the tenement, no one can manufacture cigars on any floor which is by any one person occupied for doing any household work whatever.

It is impossible, we think, to hold that this Act is a police enactment to preserve public health, because it clearly fails to accomplish that purpose to any reasonable extent. It does, on the contrary, quite another thing. It strikes with unjust and cruel severity a class of humble manufacturers, too poor to live elsewhere than in crowded tenement houses, unable to have a store on their premises, or to rent a shop outside of their residences in which to do their work, but constrained by the necessities of their families or themselves to use a part of their rooms to carry on their daily occupation. They are singled out with keen discrimination and their industry is made a crime, unless they submit to abandon it or find employment outside of their homes. If the Act were general and aimed at all tenement houses, and prohibited for sanitary reasons the manufacture of cigars and tobacco in all such buildings, or if it prohibited such manufacture in the living rooms of all tenants, another case would be presented. But in the form in which it comes before us it is so unjust in its inequality, so harsh and oppressive upon the labor of poverty, so keenly discrim-

inative in favor of the stronger classes engaged in the same occupation, that it certainly ought not to have been enacted; but, being enacted, ought to be held invalid because it deprives the appellant of his right and liberty to use his occupation in his own house for the support of himself and family, and takes away the value of his labor, which is his property protected by the Constitution equally as though it were in lands or money, without due process of law.

We are, therefore, of opinion that the Act in question should be adjudged to be unconstitutional, and that the order of the court below should be reversed and an order entered discharging the appellant from imprisonment.

BRADY, J., concurred.

DANIELS, J.:

I agree entirely in the views expressed in this opinion and add as a further reason supporting the conclusion that the Act was not in fact intended for the promotion of the public health, the omission to include tenement-houses in the other cities of the State within its prohibitions. If it was necessary for New York and Brooklyn, it was for the other cities. For tobacco is prepared and cigars made in tenement-houses and residences in most or all of such cities. But they have not been included and their exclusion is strong evidence that other reasons than the protection of health induced the passage of the Act. If it were necessary for one city it was for all. But by its enactment, what is a perfectly lawful occupation in all other cities is made a criminal offense under precisely similar circumstances in New York and Brooklyn. It deprived persons from there doing what it left them at full liberty to do elsewhere. The discrimination was conspicuously unjust and not warranted by the fundamental law of the State.

BRADY, J., concurred.

Order reversed and order entered discharging the appellant from imprisonment.